IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEYSTONE REDEVELOPMENT PARTNERS, LLC., | : | 1:08-cv-2265 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THOMAS DECKER, *et al.*, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | Hon.  John E. Jones III |
| | : | |
| HSP GAMING, L.P., | : | |
| | : | |
| Intervenor/Defendant | : | |

## MEMORANDUM AND ORDER

**December 16, 2009**

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Currently pending before the Court are two motions to dismiss the amended

complaint of Plaintiff Keystone Redevelopment Partners, LLC ("Keystone").

Both motions to dismiss (collectively, "the Motions"), filed by

Intervenor/Defendant HSP Gaming L.P. ("HSP") and the Board Defendants

respectively,[1] were filed on March 27, 2009. (Doc. 51) (the "HSP Motion"); (Doc. 53) (the "Board Motion"). For the following reasons, we shall grant in part and deny in part the Motions.

## I.     PROCEDURAL HISTORY

On December 18, 2008, Plaintiff Keystone initiated the instant action by filing a complaint against numerous members, past and present, of the PGCB. (Doc. 1). On January 9, 2009, HSP lodged a motion to intervene pursuant to Federal Rule of Civil Procedure 24, (Doc. 10), which we granted by way of our February 18, 2008 Order, (Doc. 37). On March 18, 2009, Keystone filed an amended complaint. (Doc. 46). On March 27, 2009 the HSP and Board Motions were filed accompanied by supporting briefs. (Docs. 51-54). On April 28, 2009 Keystone filed a joint brief in opposition to both motions. (Doc. 61). On May 11, 2009, both HSP and the Board Defendants filed reply briefs. (Docs. 62, 63). On May 22, 2009, after receiving permission from the Court, Keystone filed a sur-

---

[1] All individuals named in the amended complaint either are or were members of the Pennsylvania Gaming Control Board ("PGCB") and therefore shall be referred to collectively as the "Board Defendants." However, in its complaint, Keystone classifies the Board Defendants into two groups, the former members of the PGCB and the current members of the PGCB. The former group, which shall be referred to collectively as the "Former Board Defendants," includes the following people: Thomas Decker, Mary DiGiacomo Colins, Raymond S. Angeli, Jeffrey W. Coy, Joseph W. Marshall III, Kenneth T. McCabe, and Sanford Rivers. The latter group, which shall be referred to collectively as the "Current Board Defendants," includes the following people: Mary DiGiacomo Colins, Raymond S. Angeli, Jeffrey W. Coy, Kenneth T. McCabe, Sanford Rivers, James B. Ginty, and Gary A. Sojka.

reply brief addressing the Board Defendants' reply brief. (Doc. 67). Accordingly, having been fully briefed, the Motions are ripe for disposition.

## II.    STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a). Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* A plaintiff must make "a 'showing'"

rather than a blanket assertion of an entitlement to relief," and "without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests." *Phillips*, 515 F.3d at 232 (citing *Twombly*, 550 U.S. at 555 n.3). "[A] complaint must allege facts suggestive of [the proscribed] conduct," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 563 n.8. Therefore, "stating a claim requires a complaint with enough factual matter (taken as true) to suggest the required element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 555 n. 3).

On the other hand, "a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Id.* at 231 (citing *Twombly*, 550 U.S. 554-56, 563 n.8). Rule 8 "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

In resolving a motion to dismiss, the court may consider "matters of public record, orders, exhibits attached to the complaint, and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380,

1385 n. 2 (3d Cir. 1994).

## III.    FACTUAL BACKGROUND[2]

Pennsylvania's Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101 et seq. (the "Gaming Act"), authorized five stand-alone slot machine facilities in the Commonwealth, with two such facilities to be specifically located in Philadelphia. 4 Pa.C.S. § 1304(b).  In December 2005, Keystone was one of five entities[3] that submitted applications for the Philadelphia slot machine licenses. The PGCB held hearings related to the applications, (*see* Amend. Compl. ¶ 19), and received evidence comparing an applicant to its competitors, as authorized by 58 Pa. Code § 441a.7.(n).  On December 20, 2006, after having considered the proposals, presentations, and evidence proffered by all applicants, the PGCB rendered its decision, and on February 1, 2007 it issued an Adjudication and Order (the "Adjudication") memorializing the reasons therefor.

In the Adjudication, the PCGB noted that while a Keystone affiliate, Trump Entertainment Resorts, owned several casinos in Atlantic City, "neither HSP nor

---

[2] The instant factual recitation is based on allegations lodged in the amended complaint and information contained in public documents such as those authored by the PGCB in connection with the licensing procedure at issue in this case.

[3] The other entities included HSP; Philadelphia Entertainment and Development Partners, LP ("PEDP"); Riverwalk Casino, LP ("Riverwalk"); and Pinnacle Entertainment, Inc. ("Pinnacle").

[PEDP had] ties to any casino properties in Atlantic City, New Jersey."

(Adjudication, Rec. Doc. 11-3 at p. 100). Such an affiliation was an important

consideration for the PGCB in light of New Jersey's much lower tax rates on

gaming revenues. (Adjudication, Doc. 11-3, pp. 99-100).[4] To this end, the PGCB

explained that "if a casino operator in Philadelphia also owned a casino in Atlantic

City," there was the potential for "that operator [to] use the Philadelphia market to

gain patrons who would then be diverted to the Atlantic City property through

promotional marketing in order to gain advantage of the lower tax rate for the

casino in Atlantic City. In [doing so], the operator will obtain more profit from the

same dollar gambled in Atlantic City than it will in Pennsylvania because of the

much higher tax rate which the operator must pay here." (Adjudication, Rec. Doc.

11-3 at pp. 99-100).

While the PGCB purportedly considered a multitude of factors in rendering

its decision, an affiliation with an Atlantic City casino was one such factor that

was construed negatively against an applicant.[5] (*Id.* 100). Specifically, the PGCB

---

[4] The tax rate on gambling proceeds in New Jersey is 9%, compared to a 54% tax rate in Pennsylvania. See Adjudication, Rec. Doc. 11-3 at pp. 99-100.

[5] Keystone asserts that at no time before the issuance of the Adjudication was it notified that the PGCB would give negative treatment to an entity's affiliation with Atlantic City casinos or that such an affiliation could foreseeably cause its application to be denied. (Amend. Compl. ¶ 18, 19, 21, 27). At this juncture we note that Keystone's Atlantic City affiliations were considered positively in assessing Keystone's suitability for a Category 2 license. *See generally*

stated:

> While the Board believes that each applicant desires to make a profit in Philadelphia if granted a license, the Board also is cognizant of its duty to license casinos in Philadelphia which are in the best interests of the Commonwealth and Philadelphia. The Board finds it credible that owners of casinos in both locations may attempt to use the Philadelphia property as a gambling-incubator to gain new customers who will then be lured to its Atlantic City properties where it can earn a much larger profit on every dollar gambled. Likewise, the Board finds applicants without Atlantic City connections are more strongly motivated to compete directly against the Atlantic City competition because they have no interest in diverting patrons to the casino which has a better tax structure for the casino. Additionally, evidence has been introduced that the Trump Entertainment properties in Atlantic City have undergone bankruptcy reorganizations in order to rebuild and revitalize them. The Board believes this further supports its decision to choose other applicants who do not have other facilities so close to Philadelphia which may lure patrons to Atlantic City to assist in the rebuilding and revitalization of properties there. Therefore, the Board finds that licensing casinos in Philadelphia which do not have common ownership with Atlantic City facilities are more likely to further the interests of the Commonwealth and the public which stands to benefit through increased revenues obtained by the Pennsylvania properties.

*Id.* 100-01. Ultimately, the PGCB voted unanimously to approve the license

applications of PEDP.[6] (Amend. Compl. ¶ 17). In doing so, the Board

Adjudication.

[6] Keystone asserts that while PGCB determined that it satisfied all of the eligibility, suitability, financial fitness, and other requirements imposed by the Gaming Act, (*id.*. ¶¶ 14, 16), as referenced, the PGCB also noted that it had affiliations with Atlantic City casinos. Since the entities that received a Category 2 license had no such affiliation, (*id.* ¶ 29), Keystone concludes that its affiliation with Atlantic City casinos was the determinative factor in the PGCB denying its application for a Category 2 slot machine license. Consequently, Keystone claims that during the licensing process the PGCB either applied the Gaming Act in an unconstitutional manner or applied an unconstitutional "licencing criterion" that was not expressly imposed by the Gaming

unanimously voted to deny the Category 2 license applications of Keystone, Riverwalk, and Pinnacle.

Despite the fact that § 1204 of the Gaming Act provided the right of direct appeal to the Pennsylvania Supreme Court, 4 Pa.C.S. § 1204, Keystone elected not to appeal the PGCB's licensing decision. Riverwalk, however, did lodge such an appeal, which was ultimately denied by the Pennsylvania Supreme Court on July 17, 2007. *See Riverwalk Casino, LP v. Pennsylvania Gaming Control Bd.*, 926 A.2d 926 (Pa. 2007).[7]

In lieu of exercising its right of appeal or intervening in Riverwalk's appeal, Keystone elected to challenge the PGCB's licensing decision by instituting the instant federal lawsuit on December 18, 2008.[8] As aforestated, it filed an amended

---

Act itself. (*Id.* ¶¶ 18, 21, 27).

[7] PEDP and HSP were intervening parties in this appeal. *See Riverwalk*, 926 A.2d 926.

[8] In addition to commencing the above-captioned action, Keystone has also initiated a new proceeding before the PGCB in which it seeks to re-open the Category 2 licensing process based upon the failure of one of the initial licenses, PEDP, to comply with certain representations contained in its licensing application related to the location of its slot machine facility. (*See* Doc. 30-2) ("the Petition"). According to Keystone, PEDP's failure constitutes an "abandonment" of its license and renders PEDP ineligible and unqualified for a Category 2 license. (*Id.*). Alternatively, Keystone asserts that if PEDP's conduct does not constitute abandonment, its license should be revoked on the grounds that the information contained in its application is no longer true and correct. (*Id.*). In the instant action, it is Keystone's contention that if the licensing process is re-opened the PGCB will continue to promote and protect the putative unconstitutional policy of awarding licenses to entities sharing no affiliation with Atlantic City casinos. (*Id.* ¶ 48). This contention is based upon the PGCB's application of the unconstitutional policies in other licensing proceedings that post-date its award of the Category 2 licences. (*Id.*).

complaint on March 18, 2009, which contains the following counts: (i) Count

I–violation of the Commerce Clause asserted against the Former Board

Defendants; (ii) Count II–violation of the Commerce Clause asserted against

Current Board Defendants; (iii) Count III–violation of the Equal Protection Clause

asserted against Former Board Defendants; (iv) Count IV–violation of the Equal

Protection Clause asserted against Current Board Defendants; and (v) Count

V–violations of the First Amendment Right to Petition and Equal Protection

Clause asserted against Current Board Defendants.[9] (*See* Amend. Compl. ¶¶ 50-

85).  Keystone seeks monetary, injunctive, and declaratory relief related to these

---

[9] This count is based upon § 1308(c) of the Gaming Act, which states:

> Notwithstanding any law to the contrary, the board and the commissions shall not consider any application for a license if the applicant or any person affiliated with or directly related to the applicant is a party in any ongoing civil proceeding in which the party is seeking to overturn or otherwise challenge a decision or order of the board . . . pertaining to the approval, denial or conditioning of a license to conduct thoroughbred or harness horse race meetings respectively with pari-mutuel wagering or to operate slot machines. This subsection shall not be interpreted to affect the rights of applicants to seek judicial enforcement of mandatory obligations of the board as may be required by this part.

4 Pa.C.S. § 1308(c).  Keystone contends that this section violates the First Amendment since it prevents the PGCB from considering a license application from an entity that is exercising its First Amendment right to access the courts and to petition for redress.  Plaintiff also asserts that the provision violates the Equal Protection Clause since it unconstitutionally prevents a class of applicants, those that are challenging one of the enumerated board actions, from having pending licensure applications considered by the PGCB.

claims, as well as attorney's fees and expenses. (*See id.*).[10]

## IV. DISCUSSION

Both the HSP Motion and the Board Motion argue that the amended complaint should be dismissed based on certain threshold considerations. The Board Motion additionally argues for dismissal based on Keystone's failure to allege a claim upon which relief can be granted. We will address the arguments propounded under both categories in turn.

### A. Threshold Considerations

The threshold matters that we must address include issues involving abstention; jurisdiction, ripeness, and justiciability; *res judicata* and collateral estoppel; waiver of claims; and absolute and qualified immunity. We address these issues *ad seriatim*.

#### i. Abstention

The Board Defendants assert that abstention is appropriate under the dictates of *R.R. Comm'n of Texas v. Pullman*, 312 U.S. 496 (1941). As the Third

---

[10] Specifically, Keystone seeks a declaratory judgment that the PGCB's licensing determination violated the Commerce and Equal Protection Clauses and that § 1308 (c) of the Gaming Act is unconstitutional. Further, it seeks an injunction against the ongoing application of licensing criteria that violates the Equal Protection Clause and First and Fourteenth Amendments. The monetary damages sought by Keystone involve expenditures associated with preparing and submitting a Category 2 slot machine application, which includes the monies required to bring Keystone into compliance with the specifications of the Gaming Act.

Circuit has explained, "the *Pullman* doctrine authorizes federal court abstention when a constitutional challenge is intertwined with an ambiguous issue of state law and a likelihood exists, therefore, that clarification of the state law issue will substantially affect the constitutional inquiry." *Afran v. McGreevey*, 115 Fed. Appx. 539, 542 (3d Cir. 2004) (citing *id.*).  The application of *Pullman* abstention is a two-step process.  First, the court must find that the following three factors are satisfied: "(i) Uncertain issues of state law underlying the federal constitutional claims brought in federal court; (ii) State law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of the adjudication of the constitutional claims; [and] (iii) A federal court's erroneous construction of state law would be disruptive of important state policies." *Afran*, 115 Fed. Appx. at 542 (citations omitted).  Second, if all of these factors are present in the case, the court "must then make a discretionary determination as to whether abstention is in fact appropriate under the circumstances of the particular case, based on the weight of these criteria and other relevant factors." *Id.* (quoting *Chez Sez II Corp. v. Twp. of Union*, 945 F.2d 628, 631 (3d Cir. 1991)).[11]

---

[11] Relevant factors include "the availability of an adequate state remedy, the length of time the litigation has been pending, and the impact of delay on the litigants." *Planned Parenthood of Central New Jersey v. Farmer*, 220 F.3d 127, 150 (3d. Cir. 2000) (citation omitted).

In light of this standard, the Third Circuit Court of Appeals has held, "If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction." *Id.* at 543. In the case at bar, we do not believe that the Gaming Act is reasonably susceptible to an interpretation that would obviate or substantially modify the Equal Protection and Commerce Clause issues raised by Keystone, and the Board Defendants have failed to proffer such an interpretation.[12] Consequently, we decline to invoke *Pullman* abstention with regard to Plaintiff's Equal Protection and Commerce Clause claims insofar as they

_____

[12] In holding that abstention was inappropriate, the *Planned Parenthood* Court stated, "[G]iven the numerous meanings that could be attributed to the Act's terms, as well as the inherent uncertainty of terms such as 'substantial portion,' the Act is simply not susceptible to . . . a reading which would bring it within the confines of the Constitution. Because the Act cannot be reasonably interpreted to obviate or substantially narrow the federal constitutional question, the second [factor] required for *Pullman* abstention is lacking." *Id.* at 151. In the case *sub judice*, such vagueness and ambiguity plagues the Gaming Act. *See* 4 Pa.C.S. § 1102. Indeed, the Gaming Act memorializes certain characteristics of potential applicants that should be taken into consideration during the licensing determination. Among these are an applicant's ability to provide a "significant source of new revenue to the Commonwealth" consideration, to provide "broad economic development opportunities to citizens of the Commonwealth," and to "enhance the further development of the tourism market throughout the Commonwealth." 4 Pa.C.S. § 1102. We believe that these phrases are too vague and ambiguous to be reasonably susceptible of an interpretation that would prohibit the PGCB from applying the Gaming Act in the allegedly unconstitutional manner involved in this case. Accordingly, since Counts I-IV of the amended complaint are based upon portions of the Act that are not susceptible to an interpretation that conforms with the Constitution, these claims fail the second prong of the first step of the *Pullman* analysis and are therefore not the proper subject of *Pullman* abstention.

are based upon the PGCB's licensing decision.  We deny the Board Motion to this extent.

However, for the following reasons, we do believe that Plaintiff's § 1308(c) claim should be dismissed on *Pullman* grounds.[13]   Important to this conclusion is our cognizance of the disagreement between Keystone and the Board Defendants related to the proper interpretation of the provision.  The Plaintiff asserts that § 1308 (c) applies in a way that "unconstitutionally conditions consideration for a license on an applicant's waiver of rights protected by the First and Fourteenth Amendments," "unconstitutionally deters entities from exercising their rights to access the courts and to petition for redress for [the PCGB's] violations of law," and that "unconstitutionally discriminates against and denies applicants the equal protection of the law by excluding from consideration for a license those

_____

[13] At this juncture, we take the time to restate the dictates of that provision.  § 1308(c) states, in its entirety:

> Notwithstanding any law to the contrary, the board and the commissions shall not consider any application for a license if the applicant or any person affiliated with or directly related to the applicant is a party in any ongoing civil proceeding in which the party is seeking to overturn or otherwise challenge a decision or order of the board or commissions pertaining to the approval, denial or conditioning of a license to conduct thoroughbred or harness horse race meetings respectively with pari-mutuel wagering or to operate slot machines. This subsection shall not be interpreted to affect the rights of applicants to seek judicial enforcement of mandatory obligations of the board as may be required by this part.

4 Pa.C.S. § 1308(c).

applicants that are exercising the constitutional right to seek redress for [the PGCB's] violations of law." (Amend Compl. ¶¶ 81-83). Accordingly, Keystone avers that as a result of the instant litigation, the PGCB will invoke § 1308(c) in denying its petition to re-open the licensing process.

To the contrary, the Board Defendants assert that § 1308(c) applies in a situation where an entity is appealing a prior licensing decision and, while the appeal is pending, files another application. In such a circumstances, § 1308(c) merely precludes the PGCB from considering the new application while the appeal related to the old application is pending. The Board Defendants assert that such a provision is necessitated by the goals and objectives of the Gaming Act. Specifically, they assert that the provision promotes the following policies: (i) preventing monopolization of Category 2 licences; and (ii) honoring the numerosity restriction on license ownership. Accordingly, the Board Defendants conclude that the restriction in § 1308(c) in no way inhibits an applicant's access to the court but instead serves to impose restrictions designed to promote the interests and policies advanced by the Gaming Act.

This disagreement over the proper interpretation of § 1308(c), certainly highlights the fact that there are uncertain issues of state law involved in this case. Furthermore, these uncertain issues form the basis of the claims contained in

Count V of the amended complaint. Additionally, were the Board Defendant's interpretation accurate, the Plaintiff's First Amendment and Equal Protection claims related to § 1308 (c) might be rendered moot or, in the least, may be substantially altered. This issue is amenable to and appropriate for state court interpretation, and is fraught with the peril of misinterpretation by this Court that might disrupt Pennsylvania's licensing policies. Consequently, the three factors of the first step of the *Pullman* analysis are satisfied with respect to Keystone's challenge to § 1308 (c). We believe that the discretionary factors weigh in favor of abstention particularly because there is no obvious prejudice that would be inflicted upon Keystone by any delay occasioned by our abstention. Accordingly, we will grant the Board's Motion to the extent it seeks dismissal of Count V of the amended complaint on *Pullman* grounds.

In addition to *Pullman* abstention, both HSP and the Board Defendants urge us to dismiss Counts II and V of the complaint *in toto* pursuant to the abstention doctrine enunciated in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). The Board Defendants also ask this Court to invoke *Burford* abstention as the basis for dismissing Counts I and III insofar as they request equitable relief.

The *Burford* Court held that federal courts should abstain from questions of state law that are of local concern and within the special competence of local

15

courts. *See generally id.* *Burford* abstention is designed to prevent federal courts from interfering with "a state's efforts to regulate areas of law in which state interests predominate and in which adequate and timely state review of the regulatory scheme is available." *Chiropractic America v. Lavecchia*, 180 F.3d 99, 104 (3d Cir. 1999) (citing *Burford*, 319 U.S. at 332-34). Accordingly, *Burford* abstention is a two-step process. First, a court must determine whether timely and adequate state law review is available. *Matusow v. Trans-County Title Agency, LLC*, 545 F.3d 241, 247 (3d Cir. 2008) (quoting *Riley v. Simmons*, 45 F.3d 764, 771 (3d Cir. 1995)). Second, the court must determine "(i) whether the particular regulatory scheme involves a matter of substantial public concern; (ii) whether it is the sort of complex technical regulatory scheme to which the *Burford* abstention doctrine usually is applied; and (iii) whether federal review of a party's claims would interfere with the state's efforts to establish and maintain a coherent regulatory policy." *Hi-Tech Trans., LLC v. New Jersey*, 382 F.3d 295, 304 (3d Cir. 2004) (quoting *Chiropractic America*, 180 F.3d at 105).

We do not believe that Keystone's opposition brief takes issue with the first step of the *Burford* abstention analysis. Nonetheless, we note that § 1204 of the Gaming Act provides licensing applicants with a direct right of appeal to the Pennsylvania Supreme Court for any final order, determination, or decision of the

PGCB involving the approval, issuance, denial or conditioning of slot machine license. 4 Pa.C.S. § 1204.  Accordingly, even if Keystone had challenged the first step of the *Burford* abstention analysis, we would hold that that step has been satisfied.

With regard to the second step, Keystone concedes that the Gaming Act is of substantial public concern, (Doc. 61 p. 85), and so the first factor of the second step is satisfied.  After examining the Gaming Act, we are of the opinion that it exemplifies the type of complex, technical, and intertwined regulatory scheme to which *Burford* abstention is customarily applied.[14]  Accordingly, we address the third factor, which will require us to determine whether, in light of the nature of Keystone's claims, federal intervention will likely disrupt Pennsylvania's efforts to maintain a coherent regulatory policy related to Category 2 licensing determinations.  *See Chiropractic*, 180 F.3d at 107 (addressing the nature of plaintiff's claims in order to determine whether federal intervention would interfere with a state's regulatory scheme).

Both HSP and the Board Defendants cite to *Chiropractic* as a basis for

---

[14] The Gaming Act contains provisions that not only cross-reference each other but also provisions that require conjunctive application.  Certainly this qualifies as a "complex" and "intertwined" scheme.  Further, the Gaming Act contains provisions establishing certain policies that are within the particular expertise of the PGCB and that should be considered when making a licensing determination.  We think that this characteristic qualifies the Gaming Act as "technical" in nature.

applying *Burford* abstention in this case.  In *Chiropractic*, a case involving New

Jersey's no-fault automobile insurance law, the Third Circuit upheld the decision

of the district court to abstain on *Burford* grounds.  In concluding that abstention

was appropriate, the Third Circuit noted that federal intervention would prevent

New Jersey from maintaining a coherent regulatory policy because resolution of

the issues would require "an analysis of whether the challenged regulations . . . are

consistent with the Legislature's attempt . . . to reform New Jersey's

comprehensive no-fault insurance law . . . ," which would ultimately turn upon an

assessment of the rationality of the basis for the regulations, which would involve

an examination of the administrative procedure and the substantive result of the

state regulatory scheme." *Id.*

As we explain in more detail in our discussion of whether Keystone has

stated a claim upon which relief can be granted, *infra* § IV(B), neither Keystone's

Equal Protection Clause claim nor its Commerce Clause claim would necessarily

require us to examine the relatedness between the Gaming Act and the interests

that it purportedly advances.[15]  This conclusion is based upon our understanding

---

[15] Generally, both Equal Protection and Commerce Clause claims could potentially require a court to analyze the relatedness of a law to the policies the law potentially advances. However, as we state below, we are not necessarily forced to embark upon such an analysis for either of those claims in this case.

that Keystone challenges the way in which the PGCB applied the Gaming Act to applicants with Atlantic City affiliations. Keystone does not challenge the content of the Gaming Act nor the policies[16] that motivated its ratification. It merely challenges how the PGCB applied the Gaming Act in an attempt to advance those policies. Such a challenge does not warrant *Burford* abstention. *See Heritage Farms, Inc. v. Solebury Twp.*, 671 F.2d 743, 747-48 (3d Cir. 1982) (refusing to apply *Burford* abstention in a case involving land use issues because *inter alia*, the plaintiff was not attacking the municipal planning code but the conduct of the township board in *applying* it unconstitutionally).[17] Accordingly, we shall deny

---

[16] Considerations for issuing a Category 2 license include determining whether the "issuance of a license will enhance tourism, economic development or job creation is in the best interests of the Commonwealth and advances the purposes of this part." 4 Pa.C.S.§ 1325(a). Specifically, the PGCB's licensing determinations are to promote the following interests advanced by the Gaming Act: "(i) providing a significant source of new revenue to the Commonwealth to support property tax relief, wage tax reduction, economic development opportunities and other similar initiatives; (ii) providing broad economic development opportunities to the citizens of this Commonwealth; (iii) preventing possible monopolization; and (iv) enhancing the further development of the tourism market throughout the Commonwealth, including but not limited to year round recreational and tourism locations in this Commonwealth." *Id.* § 1102.

[17] Of particular note in this case, and in contravention to *Chiropractic*, is our conclusion that the issues in this case do not require us to delve into the legislative history of the Gaming Act to identify the interests and policies it advances because the same are memorialized in the text of the provision itself. Further, as we briefly noted above and explain in greater detail below, the resolution of Keystone's Equal Protection and Commerce Clause claims does not necessarily hinge upon an assessment of the quality of the relationship between the text of the Gaming Act and the policies and interests it purportedly advances. Accordingly, at this stage of the litigation, the appropriateness of invoking *Burford* abstention is not at all clear. Both the Board Defendants and HSP are granted leave to raise *Burford* abstention in any future motion as may be filed should discovery reveal that an analysis of the aforementioned relatedness is necessary to the

the instant Motions insofar as they request that we abstain from the Equal

Protection and Commerce Clause causes of action related to the PGCB's licensing

decision on *Burford* grounds.

Finally, the Board Defendants suggest that we should abstain pursuant to

the dictates of *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942). *Brillhart* was a

case between insurance carriers involving the Declaratory Judgment Act, 28

U.S.C. § 2201.[18] The *Brillhart* Court emphasized that the jurisdiction conferred by

the Declaratory Judgment Act was discretionary in nature, meaning that federal

courts were not compelled to exercise the same. *Id.* at 494.

> The factors considered by the Court in exercising its discretion include,
> but are not limited to: (i) whether declaratory relief would clarify and
> settle the legal relations in issue; (ii) the convenience of the parties; (iii)
> the public interest in a settlement of the uncertainty of obligation, (iv)
> the availability and relative convenience of other remedies; and (v)
> whether the declaratory judgment act is being used for "procedural
> fencing," "forum shopping," or as a means to provide another forum in
> a "race" for res judicata.

*Dish Network Corp. v. TiVo, Inc.*, 604 F.Supp.2d 719, 723 (D. Del. 2009) (quoting

---

resolution of the claims that survive the instant Motions.

[18] The Declaratory Judgment Act states, in relevant part, "In a case of actual controversy
within its jurisdiction . . . any court of the United States, upon the filing of an appropriate
pleading, *may* declare the rights and other legal relations of any interested party seeking such
declaration, whether or not further relief is or could be sought . . . ." 28 U.S.C. § 2201 (emphasis
added).

*Terra Nova Ins. Co. v. 900 Bar, Inc.*, 887 F.2d 1213, 1224 (3d Cir. 1989)).

Another relevant consideration is the "the existence of a state court proceeding involving the same issues and parties." *Nat'l R.R. Passenger Corp. v. Pennsylvania Public Utility Comm'n*, 342 F.3d 242, 258 (3d Cir. 2003).

Although Keystone's decision to file the instant action in federal court in lieu of raising its claims in an appeal before the Pennsylvania Supreme Court, as specifically authorized by the Gaming Act, may justifiably lead to the inference that it was forum shopping, we believe that other factors militate in favor of exercising jurisdiction in the case *sub judice*.[19]  Accordingly, we shall deny the instant Motions insofar as they request that we abstain pursuant to the dictates of *Brillhart*.

In sum, we shall grant the Board  Motion invoking *Pullman* abstention insofar as it relates to Plaintiff's § 1308(c) claim.  We shall decline the Motions insofar as they raise additional abstention arguments pursuant to *Pullman*,

---

[19] Declaratory relief would clarify the legal relation between the Board Defendants and Keystone as it would determine the former's past and future legal obligations to the latter relative to the rendering of licensing decisions. Further, we believe that declaratory relief is in the public interest as it would establish the constitutional contours of the Gaming Act, which would allow the PGCB to tailor its licencing decisions in a way that survives constitutional scrutiny. This will give the licensees repose and allow them to expeditiously construct their Pennsylvania facilities, which will, in turn, result in a more rapid realization of the Gaming Act's economic benefits by the citizens of Pennsylvania. Finally, there is no currently pending parallel state court proceeding involving the same issues and parties.  We believe that these factors militate in favor of exercising jurisdiction.

*Burford*, and *Brillhart*.  Accordingly, at this point of our analysis, the Plaintiff's Equal Protection and Commerce Clause Claims against the Board Defendants are viable.  We now proceed to consider those claims in light of the remaining threshold issues raised in the Motions.[20]

### ii.    Jurisdiction, Ripeness, and Justiciability

It is axiomatic that federal courts have jurisdiction  to adjudicate an action only if "it constitutes a justiciable 'case' or a 'controversy' that has real consequences for the parties." *Common Cause of Pennsylvania v. Pennsylvania*, 447 F. Supp. 2d 415, 422-23 (M.D. Pa. 2006) (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).[21]  An essential component of the "case or controversy" requirement is that "a litigant have the standing to invoke the authority of the federal court . . . ." *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).  With regard to

---

[20]  At this juncture we note that the Board Defendants have also asserted that abstention pursuant to the dictates of *Younger v. Harris*, 410 U.S. 37 (1971) applies in this case.  However, in their briefs, the Board Defendants elect not to address the *Younger* doctrine under their abstention discussion, but rather as the basis for their "waiver" argument. In an effort to promote continuity and ease of reference, we shall do the same. *See* § A(iii).

[21]  "[T]he ripeness doctrine, like other justiciability doctrines, derives ultimately from the requirement in Article III of the United States Constitution that federal courts are only empowered to decide cases and controversies." *Nextel Communs. of the Mid-Atlantic, Inc. v. City of Margate*, 305 F.3d 188, 192 (3d Cir. 2002).  Ripeness is wanting where a claim "rests upon contingent future events that may not occur as anticipated or indeed may not occur at all." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 561 (3d Cir. 2001) (quoting *Texas v. Untied States*, 523 U.S. 296, 300 (1998)).

standing, the United States Supreme Court has stated:

> to satisfy Article III's standing requirements, a plaintiff must show (i) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (ii) the injury is fairly traceable to the challenged action of the defendant; and (iii) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted). In the case at bar, the Board Defendants assert that Keystone lacks standing to bring its claims for past and future harms against the Former Board Defendants and Current Board Defendants, respectively.[22]

With regard to Keystone's claims involving past harms, the Board Defendants posit two arguments as to why Keystone lacks standing to assert these claims. First, the Board Defendants opine that Keystone was not "injured" by the PGCB's licensing decision because Keystone had no right to the award of a Category 2 license. But it is well to note that,

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the

---

[22] HSP, on the other hand, only contends that Keystone lacks standing to proceed on its claims of future harm against the Current Board Defendants. HSP also asserts that the claims for future injunctive relief are not ripe.

barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of a barrier, not the ultimate inability to obtain the benefit.

*Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Phrased differently, the United States Supreme Court stated that the injury was not the denial of the license itself but the denial of the opportunity to compete against other entities for the license on equal terms. *See id.*

Accordingly, the fact that Keystone was not entitled to the award of a license is completely irrelevant to the determination of whether it sustained an injury. The germane fact alleged in the amended complaint is that the PGCB discriminated against Keystone because of its affiliation with Atlantic City casinos. In other words, Keystone alleges that it was denied the ability to compete against other entities on equal terms for the Category 2 licenses because of that affiliation. Contrary to the assertions of the Board Defendants, per the dictates of *Associated General*, this satisfies the "injury prong" of the standing requirement relative to its claims for past harms. *See also Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board*, 172 F.3d 397, 404-05 (6th Cir. 1999) (holding that plaintiff's injury was not the denial of a

gaming license but the denial of the ability to compete on equal footing with other entities vying for the licenses).

The Board Defendants also challenge the "causal prong" of the standing requirement, opining that nothing in the Adjudication reflects that the PGCB denied Keystone's application *because* of its affiliation with Atlantic City casinos. The Board Defendants further assert that the PGCB treated that affiliation positively with regard to a number of other licensing considerations. We also find this argument unavailing. While the PGCB stated that it considered a multitude of actors in rendering its licensing decision, it also unequivocally stated that "licensing casinos in Philadelphia which do not have common ownership with Atlantic City facilities are more likely to further the interests of the Commonwealth and the public which stands to benefit through increased revenues obtained by the Pennsylvania properties." Adjudication p. 100-01. In addition to this, Keystone has averred that the entities receiving the two Philadelphia slot-machine licenses had no affiliation with Atlantic City casinos. Accordingly, construing the amended complaint in a light most favorable to Keystone, as we must, we believe that a reasonable jury could infer that Keystone's affiliation with Atlantic City casinos, while construed positively at certain times during the licensing determination, was ultimately a determinative, causal factor in the

PGCB's decision to deny it the ability to compete on equal terms with other entities. Accordingly, we believe that Keystone has sufficiently pled the "causal prong" of the standing requirement relative to its claims for past harm. Having no other arguments before us regarding Keystone's standing as to its claims for past harms, we will deny the Board Defendant Motion to this extent.

With regard to Keystone's claims for future harm, we note that those claims are based on Keystone's assertion that the PGCB "will apply the allegedly unconstitutional licensing requirements against Keystone to deny Keystone's pending petition to re-open, as well as to take adverse action against Keystone in future proceedings." (Br. Opp. p. 11) (citing Amend Compl. ¶¶ 5, 62, 66, 76, 77, 85). Both the Board Defendants and HSP assert that Keystone lacks standing because its injury is too speculative. To this end, they note that the Petition itself requests that the PGCB declare that PEDP's Category 2 license has been abandoned, surrendered, or forfeited or that, in the alternative, the license should be revoked as a result of PEDP's failure to comply with the representations PEDP made during the licensing process. (*See generally* Doc. 52-7). Accordingly, the Board Defendants and HSP argue that the focus of the Petition is on PEDP's qualifications, eligibility, and suitability to hold a Category 2 license, not on Keystone's qualifications, eligibility, or suitability to hold the same. The Board

Defendants and HSP argue that the proceeding is merely a petition to *re-open* the licensing procedure, meaning that the resolution of the same will only involve a determination as to whether the PGCB should strip a licensee of its license; it will not involve the actual reallocation of the license, should the same be vacated. Consequently, they assert that Keystone will not suffer any "injury" as a result of the proceeding.

Despite Keystone's arguments in aid of its position, we find the logic of the Board Defendants and HSP compelling. As they posit, the proceeding currently before the PGCB involves the determination of whether PEDP has abandoned its license or should otherwise be stripped of the same. Further, Keystone has failed to aver how exactly its affiliation with Atlantic City casinos would factor into the PGCB's decision whether or not to re-open the Category 2 licensing process. Indeed, the location of Keystone's affiliates does not appear apposite to the determination of whether PEDP has abandoned its license, or if the same should otherwise be revoked as a result of PEDP's purported noncompliance with certain representations it made to the PGCB during the licensing application process. Finally, as the Board Defendants and HSP argue, it does not appear that the resolution of the Petition will in any way affect any of Keystone's rights, since the proceeding will not involve the actual redistribution of PEDP's license should the

same be deemed abandoned or revoked.[23]  Accordingly, we do not believe that the PCGB's resolution of the pending Petition will inflict upon Keystone an "injury in fact" that is "concrete and particularized."  Consequently, it cannot base standing relative to its future harm claims on the same.

Keystone also maintains that standing for its future harm claims can be established through "adverse action [taken] against Keystone in future [licensing] proceedings."  However, as the Board Defendants and HSP note, the only two Category 2 licenses authorized for the Philadelphia metropolitan area have been awarded to HSP and PEDP, respectively.  Accordingly, there are no Category 2 licenses currently available, meaning that, at this point in time, there will be no future Category 2 licensing proceedings scheduled.  For any such proceeding to be scheduled in the future, the PGCB must revoke the Category 2 license it awarded to either HSP or PEDP.  While there is a pending proceeding before the PGCB seeking to revoke PEDP's license, the outcome of the same is in doubt. Consequently, since the occurrence of any future licensing proceedings is less than certain, to base standing based upon the same would require us to engage in the

---

[23] To be sure, a resolution of the Petition that invalidates or revokes PEDP's Category a license might make a license available upon application to Keystone.  However, to reiterate, a resulting application would involve a *privilege* to receive a license and not a *right* held by Keystone.

type of mere conjecture that has been consistently proscribed by the United States

Supreme Court. *See e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 188, 137

(2007) (holding that standing will not lie where matters remain conjectural or

hypothetical); *Vermont Agency of Nat. Res.v. U.S. ex rel. Stevens*, 529 U.S. 765,

771 (2001) (requiring an injury to be "actual and imminent," not "conjectural and

hypothetical"); *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)

(requiring the injury be "real and immediate," not "conjectural and hypothetical").

We decline any invitation to deviate from this established precedent.

Consequently, we shall dismiss Counts II and IV for lack of standing.[24]

Additionally, as HSP asserts, we believe that Counts II and IV could be

properly dismissed on ripeness grounds. As aforestated, ripeness is wanting where

a claim "rests upon contingent future events that may not occur as anticipated or

---

[24] Keystone argues that standing is established through the dictates of *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397 (6th Cir. 1999). As aforstated, this case stands for the principle that the "injury" prong of the standing requirement can be satisfied if a plaintiff was denied the opportunity to compete on equal terms with the other entities vying for a license. Accordingly, the *Lac Vieux* Court held that in order to establish standing, a plaintiff must only show that it was "willing and able" to compete, not that it was the best candidate for the license. *See Lac Vieux*, 172 F.3d at 404-05. However, that case is distinguishable from the matter *sub judice* because it involved a situation where the licensing process was not complete, meaning that there were available licenses to distribute. However, in the case at bar the licensing process is complete and all licenses have been awarded. Accordingly, unlike the plaintiffs in *Lac Vieux*, while Keystone may be *ready* to compete, it is not *able* to compete. The same analysis renders inapt Keystone's contention that *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490 (7th Cir. 2005), establishes its standing.

indeed may not occur at all." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 561 (3d Cir. 2001) (quoting *Texas v. Untied States*, 523 U.S. 296, 300 (1998)). "[T]o establish ripeness in a declaratory judgment case, the plaintiff need only show: (i) adversity of the parties' interests, (ii) the conclusiveness of the judgment, and (iii) the utility of the judgment." *Khodara Envtl., Inc. v. Pennsylvania Dep't of Envtl. Protection*, 376 F.3d 187, 196 (3d Cir. 2004) (internal quotations omitted) (citations omitted). Keystone asserts that *Khodara* establishes the ripeness of its future harm claims gains the Current Board Defendants.

*Khodara* involved a landfill developer's attempt to secure a declaratory judgment to the effect that the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, P.L. 106-181 ("Wendell Ford Act"), did not prohibit it from developing a landfill in a specific region. In its analysis, the *Khodara* Court concluded, *inter alia*, that the third prong was satisfied because a declaratory judgment as to the applicability of the Wendell Ford Act would be of utility to the landfill developer because the judgment would place it "in a position to know whether it should undertake the expensive project of redesigning the site plan and trying once again to obtain state permits." *Khodara*, 376 F.3d at 198. No such utility attends our decision in the case at bar because even if we were to declare

that the PCGB could not construe Keystone's Atlantic City affiliations against it in the resolution of the pending Petition, it does not necessarily follow that the PGCB would revoke PEDP's license, thereby making a license available to Keystone, because any declaration issued by this Court would touch absolutely none of the issues presented in the Petition. Accordingly, unlike the situation in *Khodara*, our declaration would not necessarily provide Keystone guidance as to whether or not it should expend additional monies in connection with its attempt to secure a Category 2 license. Consequently, we do not believe that the issues presented in Counts II and IV of the amended complaint are ripe for judicial review.

In summary, we believe that Keystone has proper standing to assert Counts I and III of the amended complaint lodged against the Former Board Defendants and therefore deny the instant Motions to that extent. However, we are of the opinion that Keystone lacks standing to assert its future harm claims contained in Counts II and IV of the amended complaint, and we further believe that the claims contained in those counts are not ripe. Therefore, we will dismiss Counts II and IV on those grounds and grant the instant Motions to that extent. Accordingly, our discussion of matters from this point forward shall focus exclusively on the claims against the Former Board Defendants asserted in Counts I and III of the amended complaint.

### iii.    Waiver of Claims

In their brief in support, the Board Defendants assert that Keystone waived

its constitutional claims by failing to raise them in an appeal to the Pennsylvania

Supreme Court.  Keystone, noting that its constitutional claims are asserted

pursuant to § 1983, responds by citing, *inter alia*, *Porter v. Nussle*, 534 U.S. 516,

523 (2002), for the proposition that "[o]rdinarily, plaintiffs pursuing civil rights

claims under 42 U.S.C. § 1983 need not exhaust administrative remedies before

filing suit in court."  In their reply brief, the Board Defendants counter this

assertion by raising the abstention doctrine enunciated in *Younger v. Harris*, 401

U.S. 37 (1971).[25]

In *Younger*, the Supreme Court of the United States held that a federal court

should generally abstain from enjoining pending state criminal proceedings.

*Bresko v. John*, 31 Fed. Appx. 56, 58 (3d Cir. 2002).  The *Younger* doctrine was

eventually extended to non-criminal state civil proceedings, *Huffman v. Pursue,*

*Ltd.*, 420 U.S. 592 (1975), and state administrative proceedings, *Middlesex County*

*Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982), "in which

---

[25] While the Board Defendants did not mention *Younger* in their supportive brief as the
basis of their waiver claim, their reply brief makes clear that *Younger* was the foundation for the
same.  Accordingly, we construe the Board Defendants' waiver issue as a *Younger* abstention
argument.

important state interests are implicated, so long as the federal claimant has an opportunity to raise any constitutional claims before the administrative agency or in state-court judicial review of the agency's determination." *O'Neill v. City of Philadelphia*, 32 F.3d 785, 789 (3d Cir. 1994) (citing *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 629 (1986)).  Accordingly, the Board Defendants argue that Keystone's constitutional claims should be deemed waived pursuant to *Younger* because it had the opportunity to raise those claims in challenging the PGCB's licensing decision before the Pennsylvania Supreme Court, but elected not to do so.

Courts are to apply a three-pronged test in determining whether to abstain pursuant to *Younger*: (i) there are ongoing state proceedings of a judicial nature;[26] (ii) these proceedings implicate important state interests; and (iii) the state proceedings offer adequate opportunity to raise federal claims. *See Middlesex*, 457 U.S. at 432; *see also Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 408 (3d Cir. 2005).  Augmenting these limitations, courts in the Third Circuit have consistently held that *Younger* abstention should only be invoked where state

---

[26] In applying the first prong, the United State Supreme Court has made clear that state proceedings need not be ongoing at the time the federal complaint is before the court so long as the federal plaintiff had an adequate opportunity to resolve the federal issues in a state court proceeding. *See Huffman*, 420 U.S. at 608.

proceedings are "coercive" rather than "remedial." *See, e.g.*, *Wyatt v. Keating*, 130

Fed. Appx. 511, 514 (3d Cir. 2005); *O'Neill*, 32 F.3d at 791 n. 13 (citations

omitted); *Smolow v. Hafer*, 353 F. Supp. 2d 561, 572 (E.D. Pa. 2005); *Assisted*

*Living Assocs. of Moorestown, LLC v. Moorestown Twp.*, 996 F. Supp. 409, 432

(D.N.J. 1998). Accordingly, even if the three prong test is satisfied, courts should

not abstain if the state proceedings are remedial in nature. *See Ohio Civil Rights*

*Comm'n*, 477 U.S. 627 n.2.[27]

Our application of these standards to the extant facts of this case indicates

that *Younger* abstention is inappropriate. While it is true that Keystone could have

either filed an appeal with the Pennsylvania Supreme Court or joined in

Riverwalk's appeal, we believe that these proceedings could not be classified as

"coercive" in nature, and in fact the Board Defendants do not argue otherwise.

Indeed, Riverwalk initiated its appeal to contest the PGCB's licensing decision;

the PGCB did not initiate it to enforce the same. The same would apply to any

appeal Keystone would have filed. Accordingly, we believe that any appeal of the

---

[27] The distinction between "remedial" proceedings and "coercive" proceedings has been drawn as follows. "In remedial state proceedings, the plaintiff is attempting in both state and federal courts to vindicate a wrong inflicted by the state; in coercive state proceedings, the federal plaintiff is the state court defendant, and the state proceedings were initiated to enforce a state law." *Remed Recovery Care Ctrs. v. Twp. of Worcester*, 1998 WL 437272 (E.D. Pa. 1998) (citing *O'Neill*, 32 F.3d at791 n. 13).

PGCB's licensing decision to the Pennsylvania Supreme Court would constitute a "remedial" proceeding incapable of forming the basis for *Younger* abstention.[28] Consequently, we shall deny the Board Defendant's Motion insofar as it argues for the dismissal of the amended complaint based upon *Younger* abstention or waiver grounds.

### iv. *Res Judicata* and Collateral Estoppel

There are certain instances in which a federal court is bound to honor the judgments rendered by a state court, particularly when the doctrines of *res judicata* (or "claim preclusion") and collateral estoppel (or "issue preclusion") apply. *See San Remo Hotel, L.P. v. County of San Francisco, California*, 545 U.S. 323, 336 (2005) (citations omitted).

The doctrine of *res judicata* bars an action in federal court in light of a prior state proceeding only to the extent that the prior state proceeding would bar the action in state court pursuant to applicable state law. *See Kremer v. Chem. Const.*

---

[28] This conclusion is entirely consistent with *O'Neill*, which stands for the proposition that even where, as here, "an adequate state-court judicial review of the administrative determination is available to the federal claimants, and . . . the claimants have chosen not to pursue their state-court judicial remedies, but have instead sought to invalidate the State's judgment by filing a federal action," *Younger* abstention is inappropriate unless "a coercive . . . proceeding has been initiated by the State in a state forum." *O'Neill*, 32 F.3d at 791.

*Corp.*, 456 U.S. 461, 482 (1982).[29]  Accordingly, we look to the law of

Pennsylvania for guidance on this issue.  Pursuant to Pennsylvania law, a federal

court should invoke *res judicata* only if: (i) the same claims asserted in the

pending matter were asserted in a prior matter;[30] (ii) the thing sued upon or for in

the pending matter was the same thing sued on or for in the prior matter;[31] (iii) the

same parties to the pending matter were parties to the prior matter;[32] and (iv) the

parties are of the same quality or in the same capacity in the pending matter as

they were in the prior matter. *See, e.g., Turner v. Crawford Square Apartments III,

L.P.*, 449 F.3d 542, 548 (3d Cir. 2006) (construing Pennsylvania law).

Currently before us are arguments that *res judicata* should apply to both the

_____

[29]  In certain circumstances, *res judicata* applies with equal force to determinations of state agencies as it does to determinations of state courts. *See Kentucky West Virginia Gas Co. v. Pennsylvania Pub. Util. Comm'n*, 721 F. Supp. 710, 715 (M.D. Pa. 1989) (citations omitted) ("[W]here an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts will not hesitate to apply *res judicata* principles.").

[30] A claim is considered to have been asserted in a prior matter if it was or could have been asserted in that matter. *See, e.g., Balent v. City of Wilkes-Barre*, 669 A.2d 309, 313 (Pa. 1995).

[31] The thing sued upon or for in the prior matter is the subject matter, thing in dispute, or the matter presented for consideration in the prior matter. *Twp. of McCandless v. McCarthy*, 300 A.2d 815, 820 (Pa. Cmwlth. 1973). Isolating the alleged wrongful conduct is critical to identifying the subject matter. *See Gregory v. Chehi*, 843 F.2d 111, 116 (3d Cir. 1988).

[32] The parties to the prior matter include not only those who were actually named as parties in that matter, but also anyone who is in privity with any of them. *Stevenson v. Silverman*, 208 A.2d 786, 788 (Pa. 1965).

PGCB's licensing decision and to the Pennsylvania Supreme Court's resolution of Riverwalk's appeal of that decision. We address these in turn.

HSP notes that in the brief Keystone submitted to the PGCB during the licensing process Keystone asserted that its affiliation with Atlantic City casinos should not detract from it application. Accordingly, HSP argues that the Adjudication should be afforded preclusive effect with respect to the instant matter because Keystone raised the affiliation issue during the licensing process. This argument is unavailing. Quite simply, the claims raised by Keystone in the instant proceeding *arose out of* the PGCB's licensing decision, as memorialized in the Adjudication, meaning that they did not exist, and were incapable of resolution, prior thereto. Further, while the affiliation issue was raised during the licensing process, there is no indication that the manner in which it was addressed therein was related to the unconstitutional, discriminatory conduct referenced in the amended complaint. Accordingly, we do not believe that the first prong of the *res judicata* calculus applies to the Adjudication and therefore decline to afford *res judicata* effect to the determinations made therein.

With regard to the Pennsylvania Supreme Court's resolution of Riverwalk's appeal, 926 A.2d 926 (Pa. 2007), we note that while Riverwalk raised the issue of Atlantic City affiliations in connection with that proceeding, we do not believe,

and there is no indication to the contrary, it did so relative to the discriminatory conduct referenced in the amended complaint. Indeed, not even once does the opinion of the Pennsylvania Supreme Court mention the Equal Protection Clause or the Commerce Clause. Accordingly, we are left with the inescapable conclusion that while the Pennsylvania Supreme Court addressed the affiliation issue, it did not attempt to pass judgment on whether considerations involving the same constituted unconstitutional discrimination. Accordingly, since the federal constitutional issues present in the case *sub judice* were not addressed in Riverwalk's appeal to the Pennsylvania Supreme Court, we cannot find that Riverwalk asserted the same claims as those that undergird the instant action. Since the first prong of the *res judicata* analysis cannot be satisfied, we decline the invitation to extend the doctrine to the determinations made by the Pennsylvania Supreme Court in resolving Riverwalk's appeal. *See Chada v. Chada*, 756 A.2d 39, 43 (Pa. Super. Ct 2000) (citations omitted) (holding that the essential inquiry in determining whether *res judicata* principles should apply is whether or not the ultimate and controlling issues have been decided in a prior proceeding in which the present parties had an opportunity to appear and assert their rights).[33]

_____

[33] To the extent that HSP would argue that the first prong of the *res judicata* analysis is satisfied because the constitutional claims *could have* been raised in Riverwalk's appeal to the Pennsylvania Supreme Court, we disagree. In the Pennsylvania Supreme Court's opinion

With regard to collateral estoppel, that doctrine bars a lawsuit where "(i) an issue decided in a prior action is identical to one presented in a later action, (ii) the prior action resulted in a final judgment on the merits, (iii) the party against whom collateral estoppel is asserted was a party to the prior action, or is in privity with a party to the prior action, and (iv) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action." *Plaxton v. Lycoming County Zoning Bd.*, - - A.2d - -, 2009 WL 4432373 (Pa. Cmwlth. Ct. 2009); *see also Levitt v. Patrick*, 976 A.2d 581 (Pa. Super. Ct. 2009). As we stated in our discussion of *res judicata*, the exact issue of discrimination, as prohibited by the Equal Protection and Commerce Clauses, was not addressed either by the PGCB or by the Pennsylvania Supreme Court. Accordingly, we believe that the first prong of the collateral estoppel test cannot be satisfied.

resolving the appeal, the Court unequivocally states that Riverwalk had no affiliations with Atlantic City casinos. Therefore, Riverwalk lacked standing to raise the discrimination claims based on such an affiliation. Consequently, we do not believe that Riverwalk could have raised in its appeal claims identical to those *sub judice*.

To the extent that HSP argues that those claims could have been raised on appeal before the Pennsylvania Supreme Court because Keystone either could have and should have filed its own appeal to the Pennsylvania Supreme Court, or, in the very least, could have and should have joined in Riverwalk's appeal, we are not persuaded by the same. Indeed, this argument is akin to the waiver issue, which we have already addressed above. *See supra* § A(iii). To hold that *res judicata* principles prevented Keystone from maintaining its claims would essentially require us to hold that Keystone waived its claims by not pursuing an appeal. We decline any invitation to embark upon this contradictory path. Accordingly, HSP's reliance on *Kentucky West Virginia Gas Co.* is inapt because, unlike the circumstances thereof, Keystone was not involved in nor obligated to participate in a prior proceeding in which it could have asserted its constitutional claims.

Consequently, we will deny the instant Motions to the extent the request dismissal on the basis of collateral estoppel. *See Levitt*, 976 A.2d at 589 (quoting *In re Iulo*, 766 A.2d 335, 337 (Pa. 2001) (for the proposition that neither *res judicata* nor collateral estoppel will apply in the absence of an identity of issues)).[34]

### v.　　Absolute and Qualified Immunity

The Former Board Defendants argue that the latter should be afforded the protections of absolute immunity because they acted in a quasi-judicial capacity in rendering the licensing decision that undergirds the instant action. "Quasi-judicial absolute immunity attaches when a public official's role is 'functionally comparable' to that of a judge." *Hamilton v. Leavy*, 322 F.3d 776 (3d Cir. 2003) (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)). The Third Circuit has

---

[34] Both the Former Board Defendants and HSP argue that the *factual* findings of the PGCB as set forth in the Adjudication are entitled to preclusive effect per the dictates of *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 189 (3d Cir. 1993) ("[I]n section 1983 cases, only state administrative fact-finding is entitled to preclusive effect in the federal courts when the agency ruling remains unreviewed by state courts") (citing *University of Tennessee v. Elliot*, 478 U.S. 788, 799 (1986)). However, this citation to *Edmundson* does not accurately capture the essence of doctrine memorialized in *Elliot*. The *Elliot* Court stated that "when a state agency acting in a *judicial capacity* . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, . . . federal courts must give the agency's fact-finding the same preclusive effect to which it would be entitled in the State's courts." *Elliot*, 478 U.S. at 799 (emphasis added) (citations omitted); *see also United States v. Utah Const. & Mining Co.*, 384 U.S. 394, 422 (1966). However, as we explain in our discussion of absolute immunity, *infra* § IV(A)(v), it is not at all clear that the PGCB was acting in a judicial capacity during the licensing process. Consequently, we are unpersuaded by any argument positing that we are bound by such factual determinations in resolving the instant Motions.

held, "Regardless of job title, if a state official must walk, talk, and act like a judge as part of his job, then he is absolutely immune from lawsuits arising out of that walking, talking, and acting as are judges who enjoy the title and other formal indicia of office." *Dotzel v. Ashbridge*, 438 F.3d 320, 325 (3d Cir. 2006). "The inquiry goes to the official's job function, as opposed to the particular act of which the plaintiff complains.  Thus the relevant decisional material will be the legal and structural components of the job function, as opposed to detailed facts about specific acts and mental states." *Id.*

The Supreme Court of the United States has enumerated six considerations for determining whether a state official should be afforded quasi-judicial immunity: (i) the need to assure that the job function can be performed without harassment or intimidation; (ii) the presence of institutional safeguards against improper conduct; (iii) the degree of insulation from political influence; (iv) the use of precedent in resolving controversy; (v) the adversarial nature of the process; and (vi) the availability of appellate review. *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985) (citing *Butz*, 438 U.S. at 512).

At the outset, we note that in its resolution of Riverwalk's appeal, the Pennsylvania Supreme Court articulated its view that, for the purposes of the Pennsylvania Sunshine Act, 75 Pa.C.S. § 701 *et. seq*, the PGCB had acted in a

quasi-judicial capacity in rendering its licensing decision. In reaching this conclusion, the Pennsylvania Supreme Court relied exclusively on state law, noting that the PGCB had fact-finding and deliberative responsibilities similar to that of a judge. *See Riverwalk*, 926 A.2d at 934-35. The Former Board Defendants imply that we should give deference to the Pennsylvania Supreme Court's determination because the analysis employed by it is not substantially different than the analysis that we must employ at present.

We find this argument ineffective, since the Pennsylvania Supreme Court's determination was based upon the dictates of *Man O'War Racing Ass'n v. Pennsylvania State Horse Racing Comm'n*, 250 A.2d 172 (Pa. 1969), a case that concluded that a state commission acted in a judicial capacity when awarding licenses because it judged "the merits of each applicant in terms of complicated and multi-faceted statutory standards." *Id.* Accordingly, the commission's determination represented "much more of an adjudicative process or judicial decision than that required in issuing . . . occupational licenses, where the only determination is whether the applicant meets specific *minimum* standards." *Id.* (emphasis added). Accordingly, in resolving Riverwalk's appeal, the Pennsylvania Supreme Court analogized the PGCB's decision to the decision at issue in *Man O'War,* concluding that the PGCB acted in a quasi-judicial manner

because it considered "detailed confidential information regarding the applicants and their proposals in the course of weighing the relative merits of the proposals" and ultimately awarded the licenses "to the applicants who . . . established their eligibility . . . and have demonstrated the merits of their proposals under the comprehensive statutory standards of the Gaming Act." *Riverwalk*, 926 A.2d at 935.

At bottom, we do not believe that the Pennsylvania Supreme Court's conclusion was based on grounds that were substantially similar to the considerations articulated in *Butz* and *Cleavinger*. Indeed, in reaching its determination the Pennsylvania Supreme Court does not appear to have considered any of the those factors, instead relying on the fact that the competitiveness of the applications forced the PGCB to employ its discretion as it engaged in a comprehensive and rigorous deliberative process that required it to select the best two applicants from a pool of highly qualified applicants. While the Pennsylvania Supreme Court's determination may well have been consistent with Pennsylvania law, we are a federal court that must apply federal law to this particular issue. *Schiazza v. Zoning Hrg. Bd. of Fairview Twp.*, 168 F. Supp. 2d 361, 374 (M.D. Pa. 2001) ("[I]t is well settled that in actions brought pursuant to § 1983, immunity defenses are determined according to federal law") (citing *Howlett v. Rose*, 496

U.S. 356 (1990)). Accordingly, the disparity between the mandates established by federal law and the analysis employed by the Pennsylvania Supreme Court prevents us from giving deference to the latter. Per the dictates of *Howlett*, we must engage in the analysis established by *Butz* and *Cleavinger* in order to resolve the absolute immunity issue presently before us.

We again note that at the motion to dismiss stage, we must accept as true all factual averments in the amended complaint and all reasonable inferences therefrom. In that vein, we note that the amended complaint contains the following allegations:

34. When they adopted the unlawful licensing criterion, applied the Gaming Act and took the other actions otherwise described above, the [Former Board] Defendants were not acting in a quasi-judicial manner. Their role, in connection with the adoption and application of the unlawful licensing criterion, was not functionally comparable to that of a judge.

35. During the proceedings leading up to their denial of Keystone's application, the [Former Board] Defendants did not act as a detached and neutral decision-making body considering adversarial presentations by parties before them. Instead, the [Former Board] Defendants engaged in an open-ended inquiry free from the constraints of a judicial, or quasi-judicial, proceeding.

36. The proceedings before the [Former Board] Defendants were not conducted like an adjudicatory proceeding before an agency tribunal or administrative law judge.

37.     The [Former Board] Defendants, rather than act in a quasi-judicial manner and consider testimony elicited by parties, conducted their own inquiries and questioning. The [Former Board] Defendants and persons acting at their direction acted as both advocates and decision makers when, among other things, they both moved the admission of exhibits and then voted on the admission of same.

38.     The [Former Board] Defendants, when conducting fact finding, considered evidence that they, or persons acting at their direction, collected through investigations conducted outside of open proceedings and outside of the presence of the parties.

39.     The [Former Board] Defendants, when conducting fact finding, did not apply rules of evidence or otherwise limit the consideration of hearsay testimony or unauthenticated documents. The applicants before the PGCB did not have a reasonable opportunity to test the veracity of the evidence considered by the PGCB.

40.     The parties appearing before the [Former Board] Defendants did not have an absolute right to compel attendance of witnesses or to engage in pre-hearing discovery. Nor were the persons who appeared before the Board subject to cross-examination by competing applicants or their representatives.

41.     The [Former Board] Defendants, when they denied Keystone's application, did not rely on precedent or past licensing decisions. The [Former Board] Defendants, instead, applying an open-ended range of non-exclusive factors, conducted an unbounded inquiry and exercised policy making discretion in connection with their development and application of licensing criteria.

Amend Compl. ¶¶ 34-41.

It is our opinion that these averments cast substantial doubt as to the adversarial nature of the proceedings. Indeed, the Third Circuit has enumerated certain hallmarks thereof, including, *inter alia*: (i) a lack of *ex parte* contact on the part of the decision-making body; (ii) the opportunity for cross-examination; and (iii) the opportunity to challenge proffered evidence. Keystone has clearly averred that these hallmarks of adversarial proceedings did not attend the licensing proceedings conducted by the PGCB. Further, it is our opinion that the licensing decision rendered by the PGCB does not appear to resemble a judicial proceeding. Indeed, it is instructive to note that judges resolve legal disputes and adjudicate rights. *See Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435-36 (1993). In engaging in the licensing process, the PGCB was not faced with resolving a dispute in which one party was attempting to hold another party legally accountable for its conduct. Further, the ultimate result of the licensing proceeding did not involve a right but a privilege, *i.e.* the award of two Category 2 licenses. These determinations militate against cloaking the Former Board Defendants with quasi-judicial immunity.

With that said, we note that a few of the *Butz* factors weigh in favor of cloaking the Former Board Defendants with quasi-judicial immunity. Indeed, there was undoubtedly access to appellate review, and there is reason to believe

that safeguards adequate enough to prevent improper conduct were present.[35]

However, given our belief that certain of the *Butz* factors militate against vesting

the Former Board Defendants with quasi-judicial immunity and other factors

militate in favor of the same, we are unwilling to make a conclusive determination

without first affording the parties an opportunity to develop an evidentiary

record.[36]  Accordingly, we shall deny the Motions insofar as they involve absolute

immunity.

With regard to the issue of qualified immunity, we note that this doctrine

protects government officials performing discretionary functions so long as their

conduct does not violate established constitutional rights of which a reasonable

person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Traditionally, the test for qualified immunity involved the following:

> First, the court must determine whether the facts alleged show that the
> defendant's conduct violated a constitutional or statutory right.  If so,
> the court must then determine whether the constitutional or statutory
> right allegedly violated by the defendant was 'clearly established.'  If the
> court concludes that the defendant's conduct did violate a clearly

---

[35] *See Dotzel*, 438 F.3d at 326 (noting that public hearings, the swearing-in of witnesses, and the transcription of testimony are elements that prevent improper conduct).  There appears to have been such elements present in relation to the PGCB's licensing decision. *See generally* 58 Pa. Code § 441.7.

[36] Indeed, in cases where there is reasonable doubt as to the applicability of the *Butz* factors, the issue of absolute immunity requires, in part, a factual inquiry. *See Green v. Cape Henlopen Sch. Dist.*, 2005 WL 3413320 * 6 (E.D. Pa. 2005).

established constitutional or statutory right,[37] then it must deny the defendant the protection afforded by qualified immunity.

*Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  However, the Supreme Court of the United States recently modified the *Saucier* test to the extent that "the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

Since our resolution of the qualified immunity issue requires us to both identify the contours of the rights afforded by the Equal Protection and Commerce Clauses and to delve into the merits of Keystone's Equal Protection and Commerce Clause claims, we shall defer our resolution of this issue until after we address the same.

**B.    Substantive Arguments for Dismissal**

Since the only surviving claims to this point are the Equal Protection and

_____

[37] In order for a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Giles v. Kearney*, 571 F.3d 318, 325 (3d Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "If officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Commerce Clause claims asserted against the Former Board Defendants, the instant discussion will be appropriately limited to issues involving these claims. We address the merits thereof *ad seriatim*.

### i. Commerce Clause Considerations

Article I of the United States Constitution states, in relevant part, "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8 (the "Commerce Clause"). While the Commerce Clause explicitly authorizes Congress to regulate interstate commerce, courts have recognized an inherent corollary to that express authority. This corollary is referred to as the "negative" or "dormant" Commerce Clause and operates as "an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." *Western & Southern Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 652 (1981) (the "Dormant Commerce Clause"). It is this aspect of the Commerce Clause that is at issue in the case *sub judice*.

The Dormant Commerce Clause "prohibits economic protectionism–that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273 (1988). "In considering whether a state law violates the [D]ormant Commerce

Clause, the inquiry is twofold: a court considers first whether 'heightened scrutiny' applies, and, if not, then considers whether the law is invalid under the *Pike*[38] balancing test." *Cloverland-Spring Green Dairies v. Pennsylvania Milk Mktg. Bd.*, 462, F.3d 249, 261 (3d Cir. 2006). Courts apply "heightened scrutiny" in situations where a state provision "discriminates against interstate commerce" in either its purpose or effect. *C& A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).[39] In establishing the applicability of heightened scrutiny, there is no requirement that the discrimination be the primary purpose or effect of the challenged provision. *See Harvey & Harvey*, 68 F.3d at 803.

Heightened scrutiny can be triggered in two ways. First, it applies when a state provision "has extraterritorial effects that adversely affect economic production (and hence interstate commerce) in other states, thereby forcing 'producers or consumers in other States [to] surrender whatever competitive

---

[38] *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

[39] "'[D]iscrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n, Inc. v. Oneida-Herkmier Solid Waste Mgmt. Auth.*, 550 U.S. 330, 331 (2007) (citations omitted). The party challenging the statute bears the burden of establishing the existence of such discrimination. *Harvey & Harvey, Inc. v. County of Chester*, 68 F.3d 788, 802 (3d Cir. 1995). If the challenging party succeeds in this endeavor, the burden shifts to the state, which must prove that "the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means." *Id.* at 797; *see also Dep't of Revenue of Kentucky v. Davis*, 121 S.Ct. 1801, 1808 (2008) (citing *Oregon Waste Sys. Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93, 101 (1994)).

advantages they may possess' to 'give local consumers an advantage over consumers in other states.'" *Cloverfield*, 462 F.3d at 261 (quoting *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 467 U.S. 573, 580 (1986)). Second, heightened scrutiny applies when the object of the provision is "local economic protectionism," meaning that it disadvantages out-of-state businesses for the benefit of in-state businesses.[40] *See Carbone*, 511 U.S. at 390.

If there is no basis for applying heightened scrutiny, *i.e.* if the state provision at issue "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental," the provision violates the Dormant Commerce Clause only if the burden it imposes on interstate commerce is clearly excessive in relation to the putative local benefits for which it was adopted. *Pike*, 397 U.S. at 142. Notably, "[i]n determining whether heightened scrutiny should be applied instead of the *Pike* test, the critical consideration is the overall effect of the statute on both local and interstate activity . . . with special attention paid to whether a facially neutral state law has the effect of eliminating a competitive advantage possessed by out-of-state firms (which triggers heightened scrutiny)." *Cloverfield*, 462 F.3d at 263 (internal citations and

---

[40] In making this determination, it is immaterial whether the provision also burdens some in-state businesses. *Carbone*, 511 U.S. at 391.

quotations omitted).  With these guideposts in mind, we embark upon our analysis of the Keystone's Commerce Clause claim as contained in Count I of the amended complaint.

The Board Defendants assert that Count I does not state a claim upon which relief can be granted because, *inter alia*, Commerce Clause claims cannot be based upon a finding of fact or an analysis of an agency or court.  However, as stated above, a reasonable person could read Count I as basing the Commerce Clause claim on the PGCB's application of the Gaming Act to Keystone.  Such "as applied" claims have routinely been deemed cognizable. *See Trinova Corp. v. Michigan Dep't of Treasury*, 498 U.S. 358 (1991) (rejecting the "as applied" claim on the merits); *H.P. Hood & Sons, Inc. v. Dumond*, 336 U.S. 525, 545 (1949) (holding that the statute *as applied* violates the Commerce Clause) (emphasis added).  Consequently, we decline the invitation to dismiss on this ground.

The Former Board Defendants continue by urging that heightened scrutiny should not be applied for a variety of reasons.  First, they argue that the Gaming Act does not preclude out-of-state casino operators from coming into the Commonwealth and participating in the Pennsylvania gaming industry.  Indeed, they note that one of the Category 2 license for which Keystone was competing was awarded to PEDP, which is affiliated with the Mashantuck Pequot Tribal

Nation, which operates a resort casino on its tribal lands in the state of Connecticut. While this is true, we do not believe that it vitiates Keystone's Dormant Commerce Clause claim. As aforestated, the Dormant Commerce Clause "prohibits economic protectionism–that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state *competitors*." *New Energy*, 486 U.S. at 273 (emphasis added). In the case *sub judice*, Keystone is operating under the theory that the out-of-state entities discriminated against were those with casino affiliations located close enough to Pennsylvania to compete for monies Pennsylvania citizens devoted to gambling activities. PEDP's receipt of a Category 2 license does no violence to this theory because a reasonable person could conclude that, unlike Keystone's affiliates, PEDP's affiliates were not located close enough to Pennsylvania to compete with Pennsylvania casinos for Pennsylvania gambling dollars. Therefore, PEDP's receipt of a license does not mean that the PGCB was not discriminating against out-of-state *competitors* in its application of the Gaming Act. Consequently, we reject any argument to this effect.

The Former Board Defendants also urge that the PGCB did not discriminate against Keystone in giving negative consideration to its affiliation with Atlantic City casinos because that was only one of a multitude of factors in its licensing

decision and because that affiliation was also treated positively with regard to other licensing determinations. However, the amended complaint clearly avers that the Former Board Defendants "disqualified Keystone from receiving a license *due to* the fact that affiliates of Keystone operated casinos in Atlantic City, New Jersey." Amend Compl. ¶ 26 (emphasis added). We believe that other factual allegations in the complaint reasonably support this conclusion.[41] Accordingly, at this stage of the litigation we must take the averments as true.

Consequently, we reject the first argument because Keystone's amended complaint can be read to allege that its Atlantic City affiliation was not merely one of many factors considered by the PGCB in rendering its licensing decision but was rather the *dispositive* reason for the same. We reject the second argument not only because the Former Board Defendants have not provided any authority for the same but also because the amended complaint can be reasonably read to assert that the PGCB's negative treatment of Keystone's Atlantic City affiliation outweighed the positive treatment of the same to the extent that it became the

---

[41] In particular, Keystone alleges that the PGCB noted that it had "satisfied all of the eligibility, suitability, financial fitness and other requirements for licensure . . .," and that it "was likely to maintain a financially successful, viable, and efficient business operation which would have maintained a steady level of growth and revenue." Amend Compl. ¶¶ 14, 31. In light of these statements, we believe that Keystone has alleged sufficient facts to support its contention that its affiliation with Atlantic City casinos was the dispositive factor in the PGCB's decision to deny its application for a Category 2 license.

reason for the denial of Keystone's licensing application. Accordingly, any positive treatment given to Keystone's Atlantic City affiliation would not nullify the potential unconstitutionality of the negative treatment given to the same. Therefore, we reject the arguments recounted above.

Indeed, as we explain below, we believe that the application of strict scrutiny is appropriate. Keystone clearly alleges that the conduct of the PGCB in denying it a Category 2 license because of its affiliation with Atlantic City casinos was "taken for the avowed purpose of discriminating against interstate commerce by preventing a Pennsylvania license from being used to generate economic opportunities outside of the state to the detriment of local markets." (*Id.* ¶ 24). This conclusion is based, in part, on the following excerpts from the PGCB's Adjudication: (i) the PGCB "considered the fact of competing Atlantic City properties as a negative factor for licensure in Philadelphia," (ii) Keystone "may attempt to use the Philadelphia property as a gambling-incubator to gain new customers who will then be lured to its Atlantic City properties where [due to lower tax rates in New Jersey] it can earn a much larger profit on every dollar gambled," (iii) "applicants without Atlantic City connections are more strongly motivated to compete directly against the Atlantic City competition because they have no interest in diverting patrons to the casino which has a better tax structure

for the casino," (iv) Keystone "may lure patrons to Atlantic City to assist in the rebuilding and revitalization of properties there," and (v) "licensing casinos in Philadelphia which do not have common ownership with Atlantic City facilities are more likely to further the interests of the Commonwealth and the public which stands to benefit through increased revenue obtained by the Pennsylvania properties." Adjudication, pp. 100-01.

From this panoply, we believe that Keystone has sufficiently averred that the PGCB denied it a Category 2 license because of its fear that Keystone would, as a result of its affiliation with Atlantic City casinos, use the Category 2 license to generate economic opportunities outside of the state to the detriment of local markets. Such an application of the Gaming Act warrants heightened scrutiny because it constitutes discrimination against interstate commerce in that it burdened out-of-state competitors like Keystone to the benefit of in-state competitors such as HSP.[42] *See Carbone*, 511 U.S. at 390. Accordingly, we believe that Keystone has shifted the burden to the state to establish that the PGCB's application of the Gaming Act in this case served a legitimate local purpose and could not be achieved as effectively by any available non-discriminatory means.

_____

[42] Indeed, in the words of the *United Haulers* Court, the PGCB's application of the Gaming Act constituted "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers*, 550 U.S. at 331.

Regardless of the legitimacy of the local purposes supporting the ratification of the Gaming Act, the Former Board Defendants have not identified any non-discriminatory measures that would function as an alternative to the PGCB's application of the Gaming Act in the case *sub judice*, nor have they articulated how such measures could not achieve the articulated purposes of the Gaming Act as effectively. Consequently, we do not believe that the Former Board Defendants have carried their burden. Therefore, we are of the opinion that Keystone has stated a claim for which relief can be granted.

As noted above, we elected to delay our discussion of qualified immunity until we addressed the merits of the remaining claims. Having done so with respect to the Dormant Commerce Clause claim contained in Count I, we proceed to discuss whether the Former Board Defendants should be afforded qualified immunity with respect to that claim.[43] As stated above, we believe that Keystone has sufficiently pled a Dormant Commerce Clause claim against the Former Board Defendants. Accordingly, we must determine whether this right was "clearly established." To reiterate, in order for a right to be "clearly established," "[t]he

---

[43] As stated above, "if the court concludes that the defendant's conduct did violate a clearly established constitutional or statutory right, then it must deny the defendant the protection afforded by qualified immunity." *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006) (citation omitted).

contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Giles v. Kearney*, 571 F.3d at 325 (quoting *Anderson*, 483 U.S. at 640). "If officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Id.* (quoting *Malley*, 475 U.S. at 341).

As aforementioned, the Dormant Commerce Clause "prohibits economic protectionism–that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy*, 486 U.S. at 273. Keystone asserts that the PGCB denied its licensing as a result of its affiliation with Atlantic City casinos, believing that that affiliation would motivate Keystone to divert Pennsylvania gambling dollars to Atlantic City in light of the lower tax rate on gambling proceeds in New Jersey. Such an allegation clearly ascribes to the PGCB an intent to benefit in-state economic interests to the detriment of out-of-state competitors. This incontrovertibly falls within the ambit of clearly established conduct proscribed by the Dormant Commerce Clause. Consequently we decline the invitation to cloak the Former Board Defendants with qualified immunity related to the Dormant Commerce Clause claim asserted against them. Accordingly, we proceed to our analysis of the Equal Protection Clause claims asserted against the Former Board Defendants.

## ii.    Equal Protection Considerations

The Equal Protection Clause prevents "governmental decision-makers from treating differently persons who are in all relevant aspects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).  In other words, the Equal Protection Clause prevents government decision-makers from unjustifiably creating classifications of people who, collectively, are treated differently than other, similarly situated classifications of people. *See, e.g.*, *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).[44]  In analyzing an Equal Protection Clause claim, the

---

[44] The Former Board Defendants assert that the Equal Protection Clause is not implicated by the PGCB's licensing decision because it treated all similarly situated applicants the same. To wit, they claim that an applicant's affiliation with Atlantic City casinos was so significant that it rendered it dissimilarly situated to applicants that lacked such an affiliation.  Accordingly, the fact that applicants with Atlantic City casino affiliations were treated differently than those without such affiliations is not violative of the Equal Protection Clause.  Rather, the Former Board Defendants assert that the dispositive inquiry is whether all applicants with Atlantic City casino affiliations (*i.e.* Keystone and Pinnacle) were treated alike.  Since both Keystone's and Pinnacle's Atlantic City affiliations were construed negatively against them, the Former Board Defendants assert hat there was no Equal Protection Clause violation because all similarly situated entities were treated alike.

It is our considered view that the Former Board Defendants draw too narrow a distinction. Indeed, if we extrapolated their rationale, the Equal Protection Clause would be eviscerated. Were their rationale valid, the government would be permitted to discriminate against any class, even those that are suspect or quasi-suspect, so long as it discriminated against *all* members of that class because it would be able to argue that the distinguishing characteristics of the class were significant enough to render the class dissimilarly situated to other classes.  In that case, the Equal Protection Clause would only be violated if members of the distinguishing class were treated dissimilarly.  This, of course, is not the law. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976) (for the proposition that an Oklahoma law permitting females over the age of 18 to purchase 3.2% beer but requiring males to be over the age of 21 to purchase the same was unconstitutional even though it treated all males and all females alike).  Accordingly, we decline the invitation to turn the Equal Protection Clause on its head.

first step is to discern the appropriate standard of review. *Doe v. Pennsylvania Bd. of Probation & Parole*, 513 F.3d 95, 107 (3d Cir. 2008) (citation omitted).

Government action that burdens a fundamental right or targets a suspect class must be reviewed under "strict scrutiny," meaning that to survive it must be narrowly tailored to serve a compelling governmental interest. *See Abdul-Akbar v. McKelvie*, 329 F.3d 307, 317 (3d Cir. 2001) (citing *Plyler v. Doe*, 457 U.S. 201, 216-17 (1982)).[45] If the government action burdens a "quasi-suspect" class, it will be reviewed under "intermediate scrutiny," meaning that to survive it must be substantially related to an important government interest. *See United States v. Virginia*, 518 U.S. 515, 533 (1996).[46] Finally, if no suspect or quasi-suspect class is targeted and no substantial right is burdened by the government action, the "rational basis" review will be applied, meaning that the action will be upheld as constitutional so long as it is rationally related to a legitimate government interest. *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 83 (2000).

Keystone argues that strict scrutiny should be applied in the case *sub judice*

---

[45] "Suspect" classes include those based on race, religion, or alienage. *See United States v. DeJesus*, 347 F.3d 500, 514 (3d Cir. 2003) (citation omitted).

[46] "Quasi-suspect" classes include those based on gender and illegitimacy. *See Lines v. Wargo*, 271 F. Supp. 2d 649, 674 (W.D. Pa. 2003) (citing *United States v. Virginia*, 518 U.S. at 533).

because the Former Board Defendants' discriminated against entities with Atlantic City casino affiliations in a manner that affected their First Amendment right to disseminate in Pennsylvania information about an activity that was legal in New Jersey. (*See* Doc. 61 p. 61). Keystone reasons that its First Amendment rights were implicated because there was no way it could have "lured" Pennsylvania casino patrons to Atlantic City without disseminating information about its Atlantic City affiliates in Pennsylvania. (*Id.*). Accordingly, it concludes that the PGCB's licensing determination burdened its First Amendment right. *See Carver v. Foerster*, 1994 WL 912247 * 3 (W.D. Pa. 1994) (citing *Handley v. Phillips*, 715 F. Supp. 657, 673 (M.D. Pa. 1989)). While creative, we find this argument unavailing.

An examination of both the Gaming Act and the PGCB's licensing decision reveals that neither impose a burden upon Keystone's ability to advertise its Atlantic City casino affiliates in the Commonwealth of Pennsylvania. The licensing decision, and the application of the Gaming Act therein, merely burdens, and in fact inhibits, Keystone's ability to own a slot-machine casino in Pennsylvania. Accordingly, the only impact this has on Keystone's First Amendment rights is that it prevents Keystone from disseminating information about their Atlantic City affiliates in Keystone-owned Pennsylvania casinos. The

licensing decision, and the application of the Gaming Act therein, absolutely has no effect on Keystone's ability to disseminate information in other areas of Pennsylvania or in other venues located in those areas. Consequently, unlike *Lac Vieux*, the case cited by Keystone in support of this argument, the governmental act involved in the case at bar does not negatively impact a fundamental right.[47]

The Court's view of the Equal Protection Clause claim at bar is that the classification of entities upon which the claim is based is premised upon the entities' affiliation with Atlantic City casinos. Since such a class is neither suspect nor quasi-suspect, rational basis review is appropriate. *See Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366 (2001) (citing *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985) (reiterating that rational basis review is applicable to general social and economic regulations). Accordingly, as stated above, we must determine if the PGCB's classification was rationally related to a legitimate government interest. *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 83 (2000). In order to do this, we must identify the governmental interest at stake.

---

[47] In *Lac Vieux*, the Sixth Circuit Court of Appeals held that strict scrutiny should be applied to an Equal Protection Clause claim because the classifications created therein were based upon the content of certain entities' political speech. *See Lac Vieux*, 172 F.3d at 402-09. Accordingly, in that case, the governmental decision directly implicated a First Amendment right. For the reasons articulated above, we do not believe that to be the case in the matter *sub judice*.

The Former Board Defendants claim that the Gaming Act itself establishes the interests it furthers. To reiterate, these include the following: (i) the procurement of "a significant source of revenue to the Commonwealth to support property tax relief, wage tax reduction, economic development opportunities and other similar initiatives;" (ii) "providing broad economic opportunities to the citizens of this Commonwealth;" (iii) "preventing possible monopolization;" and (iv) "enhancing the further development of the tourism market throughout the Commonwealth, including but not limited to year round recreational and tourism locations in this Commonwealth." *See generally* Pa. C.S. § 1102. The Former Board Defendants maintain that these interests are legitimate goals that state state governments may pursue. *See Livadas v. Bradshaw*, 512 U.S. 107, 120 (1994) (for the proposition that a state undoubtedly has a legitimate interest in raising revenue).

While Keystone does not deny that these stated interests undergird the Gaming Act, it claims that they support its contention that the Former Board Defendants interpreted and applied the Gaming Act in a way the promoted in-state business to the detriment of out-of-state business. To paraphrase Keystone, it contends that the purpose of the Gaming Act, as applied by the Former Defendants, was to horde gamblers and erect barriers to competition, neither of

which are legitimate state objectives. *See* Amend Compl. ¶¶ 21, 25; (*See also* Doc.

61 pp. 64-65). This position is based upon the dictates of *Metropolitan Life Ins.*

*Co. v. Ward*, 470 U.S. 869 (1985), which involved an Alabama statute that

imposed a higher tax on out-of-state insurance companies doing business in the

state than it did on similarly situated in-state insurance companies. The

*Metropolitan Life* Court asserted that the statute was "designed only to favor

domestic industry within the State, no matter what the cost to foreign corporations

. . . ." *Metropolitan Life*, 470 U.S. at 878. Accordingly, the Court concluded that

"Alabama's purpose . . . constitutes the very sort of parochial discrimination that

the Equal Protection Clause was intended to prevent." *Id.* Finally, and more to

Keystone's point, the Court held that the "promotion of domestic business by

discriminating against nonresident competitors is not a legitimate state purpose."

*Id.* at 882; *see also Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2000)

("Courts have repeatedly recognized that protecting a discrete interest group from

economic competition is not a legitimate governmental purpose.") (citing *City of*

*Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).

Since we must construe all facts and reasonable inferences therefrom in

Keystone's favor, we believe it has sufficiently alleged that the Former Board

Defendants applied the Gaming Act in a way that was designed to benefit in-state

business to the detriment of out-of-state competitors. Accordingly, this purpose would constitute "local economic protectionism" and, pursuant to the dictates of *Metropolitan Life*, would not be considered a "legitimate governmental interest." Consequently, the conduct of the Former Board Defendants cannot satisfy the rational basis test.

Having concluded that Keystone has sufficiently pled an Equal Protection claim for which relief can be granted, we finally turn our attention to the issue of qualified immunity. Since we have determined that Keystone has sufficiently pled a violation of its Equal Protection rights, we must consider whether the right violated was "clearly established." *See Williams*, 455 F.3d at 190. As aforementioned, the dictates of *Metropolitan Life* establish in no uncertain terms that the "promotion of domestic business by discriminating against nonresident competitors is not a legitimate state purpose." *Metropolitan Life*, 470 U.S. at 878. Since Keystone has supplied sufficient facts to support its conclusion that the object of the Gaming Act, as applied by the Former Defendants to licensing applicants with Atlantic City affiliates, was local economic protectionism, we conclude that the rights allegedly violated by the Former Board Defendants were in fact clearly established at the time they made their licensing decision. Consequently, we deny the invitation to cloak the Former Board Defendants with

qualified immunity with regard to Keystone's Equal Protection Clause claim contained in Count III of the amended complaint.

## C.     Conclusion

For the reasons stated above, we will grant in part and deny in part the Motions.  We shall grant the HSP Motion (Doc. 51) and the Board Motion (Doc. 53) to the extent that they seek dismissal of Counts II and IV on jurisdictional grounds and to the extent that they seek dismissal of Count V based on *Pullman* abstention.  We shall deny the Motions in all other respects.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The HSP Motion (Doc. 51) and the Board Motion (Doc. 53) are **GRANTED IN PART** and **DENIED IN PART** to the following extent:

   a.     The Motions are **GRANTED** insofar as they seek dismissal of Counts II and IV on jurisdictional grounds.

   b.     The Motions are **GRANTED** insofar as they seek dismissal of Count V based on *Pullman* abstention.

c.     The Motions are **DENIED** to the extent that they seek dismissal of Counts I and III.

<u>s/ John E. Jones III</u>
John E. Jones III
United States District Judge
